**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SUMMERLY PARROTTA, | |
| Plaintiff, | Civil Action No. 21-13602 (FLW) |
| v. | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | **OPINION** |
| Defendant. | |

**WOLFSON, Chief Judge:**

Summerly Parrotta ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, born on June 16, 1976, was 39 years old on her alleged disability date of January 30, 2016. (A.R. 18, 56.) On May 24, 2019, Plaintiff filed a Title II application, alleging disability due to lower back arthritis, herniated discs in her neck and back, fibromyalgia, bursitis in both hips, muscle spasms in her lower back and shoulders, depression, and anxiety. (A.R. 12, 156.) Plaintiff sought benefits for the period of disability from January 30, 2016 to December 31, 2017. The claim was denied initially on September 24, 2019, and upon reconsideration on March 12, 2020. (A.R. 12.) Plaintiff then filed a written request for a hearing, which was held by telephone

on November 6, 2020. (*Id.*) On November 17, 2020, the ALJ determined that Plaintiff was not disabled under the relevant statutes. (A.R. 19.)

Following the ALJ's decision, Plaintiff requested review of the ALJ's decision by the Appeals Council. (A.R. 1.) On June 22, 2021, the Appeals Council denied review, finding Plaintiff's asserted reasons for appeal did not provide a basis for reviewing the ALJ's decision. (*Id.*) This appeal ensued.

### A. Review of Medical Evidence

#### i. Medical Records Before Relevant Period

In April 2014, Plaintiff received treatment for cervical and lumbar degenerative disc disease after an MRI noted herniations indenting the thecal sac and contributing to central canal stenosis, a herniation contributing to mild bilateral neural foraminal encroachment, and a herniation that mildly indented the anterior epidural space. (A.R. 418, 420, 422.) Further, the MRI showed a broad-based disc bulge and a mild disc bulge. (A.R. 420.)

In July 2014, Plaintiff began a physical therapy course, but she missed three sessions due to her work schedule. (A.R. 205-08, 17.) In September 2014, Plaintiff was prescribed meloxicam as an anti-inflammatory for the disc herniations. (A.R. 432.)

In November 2014, at a visit with Dr. Ricardo Cruciani, M.D., Ph.D., Plaintiff rated her pain at a 5 out of 10 and described it as horrible and excruciating. (A.R. 369.) Plaintiff reported that the pain is not accompanied by weakness. (*Id.*) Furthermore, Plaintiff reported the pain interferes with sleep, standing, sitting, bed rest, bending forward, bending backwards, and worsens with weather changes. (*Id.*) Dr. Cruciani noted that Plaintiff's pain is decreased with walking, traction, heat, and cold. (*Id.*) Plaintiff stated that Percocet limited her pain to a 1 to 2 out of 10. (*Id.*) A physical examination showed decreased range of motion in her lumbar and cervical spine,

with extension and flexion due to pain. (A.R. 370.) Plaintiff showed normal motor strength, sensation, and gait without the use of an assistive device. (*Id.*)

In September 2015, Plaintiff met with neurosurgeon Dr. Lee Buono, M.D., complaining of neck pain, lower back pain, tingling in her feet, occasional tingling in her hands, and some pain in her shoulders. (A.R. 384.) Plaintiff stated that her neck and lower back pain had been bothering her for about three years. (*Id.*) Plaintiff explained that the pain becomes worse when she is working, but lessens when she is on vacation. (*Id.*) Dr. Buono noted that Plaintiff has participated in physical therapy, with no success, and has not undergone epidural steroid injections. (*Id.*) Furthermore, Dr. Buono noted current prescriptions for OxyContin, oxycodone, and Zanaflex. (*Id.*) On examination, Plaintiff demonstrated 5/5 motor strength in her arms and legs. (*Id.*) Dr. Buono observed a mildly positive Phalen's test on the right hand, indicating carpal tunnel syndrome. (*Id.*) Upon examination of Plaintiff's lower back, Dr. Buono noted mild pain upon passive flexion, extension, and lateral rotation of the lumbar spine. (*Id.*) Plaintiff showed a normal gait and station, normal tandem gait, and normal heel-and-toe walking. (*Id.*)

During the same visit, Dr. Buono reviewed Plaintiff's cervical and lumbar spine MRIs. (A.R. 385.) Dr. Buono noted a small disk bulge, without spinal compression, and some very mild lateral recess stenosis. (*Id.*) Dr. Buono told Plaintiff that he would not recommend epidural steroid injections, because she does not have significant stenosis, and that her problems "really are not radicular." (*Id.*) Instead, Dr. Buono recommended that Plaintiff "change some of her habits, including her shoes during work, and perform some stretching exercises." (*Id.*) Furthermore, he recommended that Plaintiff "wean off the narcotics" and "eventually begin some anti-inflammatory regimen as needed." (*Id.*)

Throughout 2015, Plaintiff continued monthly pain management visits. (A.R. 335-37, 342-70.) In December 2015, Plaintiff's treating physician noted that Plaintiff declined trigger point injections and facet blocks. (A.R. 336.) The record noted that Plaintiff was instructed to continue chiropractic care, acupressure, yoga, and weight loss. (A.R. 337.) Plaintiff's treating physician increased Oxycontin from 10mg twice daily to 20mg twice daily. (*Id.*)

The record further indicates that from April 2015 to July 2015, Plaintiff attended eight individual counseling sessions at Womanspace, a non-profit that provides counseling, seeking supportive services for childhood sexual abuse. (A.R. 442.) Rev. Victor, the director of Womanspace counseling services, documented Plaintiff's symptoms of increased irritability, and decreased ability to get sound sleep and focus at work. (*Id.*) Rev. Victor noted that Plaintiff reported a history of back injuries and pain, which she claimed as being exacerbated by her emotional state. (*Id.*) Plaintiff's file with Womanspace counseling services was closed after she "lost contact with the agency." (*Id.*) After these counseling sessions, the record shows no further evidence of mental health treatment beyond the prescriptions for anti-anxiety medications prescribed by Dr. Alvarez in 2017. (A.R. 223-385.)

### ii.   Medical Records During Relevant Period

In March 2016, Plaintiff attended a pain management appointment and reported "stable" symptoms with slight exacerbation of pain depending on her level of activity. (A.R. 333.) Plaintiff continued to report constant upper and midthoracic and lower back pain that increased with any activity. (*Id.*) A physical examination showed positive trigger points in the cervical, thoracic, and spine areas, as well as multiple muscular points in the upper and lower extremities. (*Id.*) Plaintiff's physician, Dr. Jorge Alvarez, noted that plaintiff was previously advised to pursue trigger point injections, but deferred this therapy. (*Id.*) A neurological examination showed normal motor

strength and no signs of focal deficit or allodynia. (*Id.*) Plaintiff further reported some insomnia, fatigue, and mild anxiety, but no signs of depression. (*Id.*) Plaintiff was observed to be calm, cooperative, alert, and oriented. (*Id.*) Dr. Jorge Alvarez refilled Plaintiff's prescription for OxyContin and Percocet with 2 refills and started her on 4mg of Zanaflex. (A.R. 334.)

In May 2016, Plaintiff reported worsening pain and inquired about treatment options outside of her opioid medications. (A.R. 331.) Plaintiff further reported reducing her working hours to part-time. (*Id.*) Plaintiff stated that she had consistent, strong pain that impacted her daily activities, both at home and work. (*Id.*) While Plaintiff agreed to proceed with the trigger point injections, she changed her mind just prior to the procedure. (*Id.*) Instead, Dr. Alvarez refilled Plaintiff's prescriptions and scheduled a follow-up appointment in four weeks. (*Id.*)

By June 2016, Plaintiff had quit her job as a hairstylist, hoping that it would decrease her chronic pain. (A.R. 329.) Plaintiff had again denied interventional procedure options and asked to continue her current medication treatment, claiming the pain had been stable with some fluctuations up and down. (*Id.*) While a physical examination displayed positive straight leg raising, lumbar spine tenderness, and positive facet joint provocation maneuvers, Plaintiff continued to demonstrate normal gait, motor strength, and neurological functioning. (*Id.*) Plaintiff still claimed high-level anxiety, depression, and insomnia. (*Id.*) Plaintiff was prescribed melatonin for her insomnia, but she reported it did not have any effect. (*Id.*) Dr. Alvarez refilled Plaintiff's other prescriptions and scheduled a follow-up appointment in eight weeks. (A.R. 330.)

In August 2016, Plaintiff reported that her pain had stabilized and that she wanted to titrate down the medications. (A.R. 327.) Dr. Alvarez decreased her OxyContin from 20mg back to 10mg. (*Id.*) Plaintiff's physical examinations revealed positive tender points, as well as tenderness in her cervical and lumbar spine areas. (*Id.*) There were no reports of motor atrophy or neurological

deficits. (*Id.*) Dr. Alvarez ultimately discontinued Plaintiff's OxyContin in October 2016. (*Id.*) Plaintiff was prescribed Celebrex, Cymbalta, Voltaren gel, and a TENS unit after complaining of a "burning pain" in her right leg and across her upper back. (A.R. 322-26.)

In November 2016, Plaintiff discontinued Percocet and switched to oxycodone after reportedly "throwing her back out." (A.R. 317-21.) However, a urine toxicology report from January 2017 showed Plaintiff was not taking her medication as prescribed. (A.R. 300.) A few weeks later, Plaintiff reported full body pain to her primary care provider, Kathleen Bornhoeft, NP. (A.R. 413.) Ms. Bornhoeft urged Plaintiff to return to Dr. Alvarez. (*Id.*) Dr. Alvarez prescribed and increased her oxycodone dose the next day. (A.R. 300-04.) Dr. Alvarez further prescribed Lyrica and recommended aquatic and massage therapy sessions. (A.R. 305.) By February 2017, Plaintiff had not complied with this referral, and discontinued her Lyrica and Cymbalta. (A.R. 299.)

In March 2017, Plaintiff attended her annual physical with Ms. Bornhoeft. (A.R. 406.) Ms. Bornhoeft reported a normal gait and station, normal tone and motor strength, and intact sensation. (A.R. 409.) However, Ms. Bornhoeft diagnosed Plaintiff with an anxiety disorder and referred her for a psychological consultation. (*Id.*) Ms. Bornhoeft recommended that Plaintiff wean off her pain medication due to possible kidney and liver side effects, and that Plaintiff pursue alternative methods for pain relief, such as acupuncture, yoga, meditation, massages, exercise, and swimming. (*Id.*) Plaintiff inquired about a medical marijuana specialist. (*Id.*)

In April 2017, Plaintiff successfully completed trigger point injections. (A.R. 288.) Following the procedure, Plaintiff reported two days of symptom exacerbation before the pain returned to base line shortly thereafter. (A.R. 281.) In June 2017, Plaintiff switched to receiving massage therapy and chiropractic maneuvers with "some benefit." (A.R. 276.)

In November 2017, Dr. Alvarez reinstated Plaintiff on 20mg of OxyContin. (A.R. 263.) Dr. Alvarez also filled a Xanax prescription for her anxiety disorder. (*Id.*) At this point, Plaintiff reported her pain was generally stable with fluctuations up and down, depending on surrounding environmental factors. (A.R. 261.) Plaintiff reported her Fibromyalgia severity was a 9/10 and neck pain an 8/10. (*Id.*) Plaintiff explained that the pain consisted of muscle aches, muscle weakness, joint pain, back pain, and swelling in the extremities, in addition to sleep disturbances and anxiety. (*Id.*) Despite Plaintiff's anxiety disorder, Dr. Alvarez's psychiatric findings were normal, noting full orientation, normal mood and affect, and an active and alert presentation. (*Id.*)

In December 2017, Plaintiff sought treatment from internal medicine specialist, Dr. Brian Shaffer, M.D. (A.R. 218.) Plaintiff had visited Dr. Shaffer in hopes of receiving "more holistic" treatment. (A.R. 217.) Plaintiff and Dr. Shaffer discussed the use of cannabidiol (CBD) oil and marijuana. (A.R. 219.) Plaintiff stated that "she would like to stop the opiates and use the marijuana for the pain." (*Id.*) Dr. Shaffer's musculoskeletal examination reported tenderness to the occiput, upper rhomboids bilat, and bilat scap. (A.R. 216.) Plaintiff reported muscle pain, tenderness, neck pain, back pain and trouble reaching above her head. (A.R. 218.) Plaintiff denied limited joint mobility, stiffness, difficulty walking or difficulty rising from a sitting position. (*Id.*) Dr. Shaffer further summarized that Plaintiff dealt with chronic back and neck pain associated with muscle spasms intractable to the mid and lower back. (*Id.*) Dr. Shaffer was unable to pinpoint the origin of the pain, "except maybe her years of hairstyling." (*Id.*)

### iii.   Medical Records After Relevant Period

In April 2018, Dr. Alvarez reported that Plaintiff had been off OxyContin for approximately a month and denied any pain exacerbations. (A.R. 251.)

By July 2018, Dr. Alvarez reported that Plaintiff still suffered myofascial pain and that she needed to take more than the recommended dosage of oxycodone. (A.R. 242.) Dr. Alvarez conducted further physical examinations which depicted no significant change in Plaintiff's musculoskeletal or neurological functioning. (*Id.*)

### iv.    State Agency Medical Opinions

On September 6, 2019, Caroline Shubeck, M.D., a state agency medical consultant, reviewed Plaintiff's medical records at the initial level and found Plaintiff to be not disabled. (A.R. 53.) Dr. Shubeck determined that Plaintiff filed insufficient evidence from the alleged onset date ("AOD") to the date last insured ("DLI") to rate the claim. (A.R. 51.) The record indicates that adequate measures were taken on five separate occasions to obtain Plaintiff's medical records. (*Id.*) On March 9, 2020, on reconsideration, Dr. Howard Goldbas, M.D., affirmed Dr. Shubecks' findings and found Plaintiff to be not disabled. (A.R. 55.) Dr. Goldbas reported that, "there is a lack of sufficient evidence of physical findings prior to DLI for this Title II only claim" to succeed. (A.R. 60.)

On September 7, 2019, Teissy Meza, Ph.D., a state agency medical consultant, conducted a Psychiatric Review Technique assessment at the initial level and found insufficient evidence to evaluate the claims alleging depression and anxiety. (A.R. 52.) The record indicates "there is insufficient evidence to establish a psych MDI and assess its severity or limitations on work related mental functions prior to DLI." (*Id.*) On March 11, 2020, Richard Willens, Psy.D., a state agency medical consultant, reconsidered the Psychiatric Review Technique assessment and found no new illnesses, injuries, or changes since the last disability report. (A.R. 61.) Furthermore, Plaintiff provided no new medical records since the last report. (*Id.*) Dr. Willens found insufficient evidence to evaluate the claims. (*Id.*)

### B. Review of Testimonial Evidence

#### i. Plaintiff's Testimony

At the beginning of the hearing, Plaintiff's attorney verified his review of the documents in the record and affirmed no objections to their admission. (A.R. 27.) All documents were then moved into evidence. (*Id.*) Plaintiff's attorney agreed that all evidence has been introduced and there is "no additional information that would make a material difference." (*Id.*) Plaintiff's attorney further noted, "we are aware that the date last insured is December 31, 2017. . . It's our contention that there's objective medical evidence of record prior to that including MRIs in Exhibit 6F, pages 7 and 8, although it's a cervical and lumbar spine talking about a herniated disc at multiple levels. [There are also] extensive records documenting ongoing acute, severe neck and low-back pain. . . a diagnosis of fibromyalgia and myofascial pain. . . [and] evidence of anxiety. It would be our contention that the combined effects of all those things prevent the Claimant from returning to her past work activity. . . and basically prevent her from engaging in any activity of even a sedentary nature." (A.R. 30.) The ALJ responded "Okay." (*Id.*)

Plaintiff, first, testified that she was born on June 16, 1976. (A.R. 31.) Plaintiff explained that she is currently living with her husband in a "cape" home, with "mostly everything on one floor and the bedroom on the second floor." (A.R. 36.) Plaintiff noted that she can wash and dress herself, but has difficulty putting on clothing and sometimes requires assistance. (A.R. 37.) Plaintiff further explained that she is capable of preparing meals for herself and her husband, but it takes a while. (*Id.*) Regarding housework, Plaintiff is unable to carry baskets of clothes up and down the stairs, or vacuum for long periods of time. (A.R. 38.) Plaintiff testified that she does not always sleep through the night and will sometimes wake up in pain due to her back, hips, or neck. (A.R. 40.)

Plaintiff explained that she used to work as a hairdresser cutting, styling, and coloring hair for about eight to ten hours per day. (*Id.*) Plaintiff noted that she would be standing on her feet most of the time, but rarely had to lift anything beyond 10 to 15 pounds. (*Id.*) Plaintiff discontinued working in January of 2016 due to excruciating pain in her lower and middle back, as well as her upper shoulders. (A.R. 32.) When asked about her physical symptoms, Plaintiff explained that the pain did not start suddenly, but slowly grew as time went on. (*Id.*) Plaintiff also noted that she felt pain in her hands that led up to the elbow from doing repetitive maneuvers with the scissors and comb. (A.R. 33.) In terms of treatment, Plaintiff stated that she takes oxycodone and a muscle relaxant for the pain, as well as antidepressants and anxiety medication for her anxiety and depression. (A.R. 34.) Plaintiff testified that she took pain injections, and participated in routine stretching and light yoga poses, among other activities. (A.R. 35.) Plaintiff also visited a chiropractor, which did not relieve her symptoms, but helped "a little bit." (*Id.*)

Plaintiff additionally testified that she could sit comfortably in a chair for approximately thirty to forty minutes before her back and hips become uncomfortable, making it necessary for her to get up, stretch, and move around. (A.R. 38.) Plaintiff also noted she can comfortably walk two to three blocks before the bottom of her feet, legs, arms and sometimes back begin to hurt. (A.R. 39.) Plaintiff explained that she can write a couple of paragraphs by hand before she must take a break to "wiggle out her hand." (A.R. 40.)

Regarding her mental health, Plaintiff testified that her depression hinders her desire to interact with anybody. (A.R. 41.) Plaintiff noted her depression has been going on for a while and believes it started when she was diagnosed with fibromyalgia. (*Id.*)

### C.  ALJ Decision

On November 20, 2020, the ALJ issued a written decision analyzing whether Plaintiff satisfied her burden to demonstrate disability using the standard five-step process. (A.R. 12-19.)

10

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability. (A.R. 14.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease and fibromyalgia. (*Id.*) At step three, the ALJ determined that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the relevant CFR. (A.R. 15.) In so deciding, the ALJ considered listings 1.00 and 1.04. (*Id.*)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 CFR 404.1567(a). (A.R. 18.) Further, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, and Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. (A.R. 16.) At step four, the ALJ found that Plaintiff is unable to perform any past relevant work as a barber. (A.R. 18.)

At step five, the ALJ utilized the Medical-Vocational Guidelines[1] (the "Grids") to determine whether Plaintiff was disabled.[2] (*Id.*) In so doing, the ALJ considered the Plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (*Id.*) The ALJ explained that if Plaintiff can perform all or substantially all the exertional demands at a given level, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled." (*Id.*) He then noted that

---

[1] The Grids are tables prepared by the Commissioner that evaluate a claimant's ability to work by matching the claimant's age, education, and work experience with her work capability. 20 C.F.R. pt. 404, Subpt. P, App. 2. The Grids set forth presumptions regarding whether jobs exist in significant numbers in the national economy given the limitations possessed by the claimant. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).

[2] The ALJ did not use a vocational expert to evaluate the alternative type of work that Plaintiff could perform.

when Plaintiff cannot perform substantially all the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules can be used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled." (*Id.*) Based on Plaintiff's residual functional capacity for the full range of sedentary work, in conjunction with the Plaintiff's age, education, and work experience, the ALJ determined that Medical-Vocational Rule 201.28 directed a finding of "not disabled." *(Id.*) The ALJ concluded that there are sedentary jobs that exist in significant numbers in the national economy that the Plaintiff can perform. (*Id.*)

## II.   <u>STANDARD OF REVIEW</u>

On review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh

the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id.* § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* §423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* §1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i); see *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id.* § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id.*

§ 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id.* § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id.* § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. (*Id.*) An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at

14

428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. (*Id.*)

## III.   PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff, first, maintains that the ALJ erred in finding that Plaintiff's psychological conditions and obesity were not severe impairments. (Pl. Br. at 10.) Second, Plaintiff argues that the ALJ improperly and inadequately found that Plaintiff's impairments did not meet a Social Security listing. (Pl. Br. at 14.) In particular, Plaintiff asserts that the ALJ did not give a sufficient explanation as to whether her impairments meet the requirements of the listings. (*Id.*) Third, Plaintiff contends that the ALJ erred in formulating Plaintiff's RFC, because the ALJ failed to properly support the finding that Plaintiff has no non-exertional impairments. (Pl. Br. at 16.) Fourth, Plaintiff argues that the ALJ's finding that there were alternative jobs in the national economy that Plaintiff could perform was erroneous because it was not provided by a vocational expert. (Pl. Br. at 19.)

### A. Substantial Evidence Supports the ALJ's Evaluation of Plaintiff's Psychological Conditions and Obesity

Plaintiff asserts that the ALJ erred at step two in finding that Plaintiff's anxiety and obesity were non-severe. (Pl. Br. at 10.) Plaintiff argues that these ailments were well documented in the medical record, and further, that the ALJ did not adequately address why he determined that obesity resulted in no significant restriction in function. (Pl. Br. at 11.) For this reason, Plaintiff

contends that her anxiety and obesity met the *de minimis* requirements for finding an impairment to be severe, and therefore, the ALJ should have found those specific impairments to be severe. (Pl. Br. at 13.) I disagree, and find that the ALJ's severity determinations were based on substantial evidence.

At step two, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. "[A]n impairment is severe only if it significantly limits the claimant's physical or mental ability to do basic work activities." *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 144 (3d Cir. 2007) (internal quotations omitted). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have no more than a minimal effect on an individual's ability to work." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (internal quotations omitted). Notably, "[t]he claimant has the burden of showing that an impairment is severe." *Salles*, 229 Fed. App'x at 144.

Here, applying the appropriate reviewing standard, I find that the ALJ's severity determinations were adequate and supported by substantial evidence. Regarding Plaintiff's anxiety disorder, the ALJ found that "although the medical record references this impairment, there is no evidence to show that this impairment has had the requisite limiting effects on the [Plaintiff's] ability to perform basic work activities." (A.R. 14.) In so deciding, the ALJ noted that the Plaintiff demonstrates only mild limitations in understanding, remembering, or applying information; mild limitation in interacting with others; mild limitations in maintaining concentration, persistence, or pace; and mild limitations with adapting or managing oneself. (*Id.*) Further, the ALJ pointed out

that while the Plaintiff took Xanax, her mental status examinations were all relatively normal and her anxiety during the relevant period appeared to be "due to worries about her pain medication." (A.R. 15, 386-414.) The ALJ noted that the Plaintiff did not seek further therapy for her anxiety, and that there is no competent evidence to show that her daily activities were significantly impacted due to her alleged anxiety. (*Id.*) The ALJ also considered that while Plaintiff attended therapy in 2015 at Womanspace, the last session was July 23, 2015, and her file was closed shortly thereafter when she lost contact with the center. (*Id.*) Furthermore, the ALJ reasoned that Plaintiff had not provided sufficient evidence during the relevant period to support Plaintiff's position that her anxiety is a severe impairment. (A.R. 15.) Finally, as a general matter, the ALJ noted that the medical evidence during this period is scarce, and generally shows Plaintiff's physical symptoms were managed with conservative pain management. (A.R. 222-468.) For these reasons, the ALJ appropriately found that while the record makes some reference to anxiety, there is insufficient evidence during the relevant period to satisfy the applicable criteria. (A.R. 14.)

Regarding Plaintiff's obesity, the ALJ considered Plaintiff's impairment, but did not find that it resulted in more than mild limitations in functioning. (A.R. 15.) Specifically, Plaintiff never testified as to her obesity, nor did she mention it as a contributing factor to her joint or body pain. (A.R. 26-44.) The ALJ concluded that the Plaintiff's obesity was non-severe because there was no indication in her medical records that Plaintiff's obesity was a significant aggravating factor. (A.R. 223-385.)

In any event, although Plaintiff argues that the ALJ's obesity analysis was inadequate, Plaintiff fails to assert how this decision was harmful. On review, a plaintiff must demonstrate how the ALJ's "error to which he points could have made any difference" to the final determination. *Holloman v. Comm'r of Soc. Sec.*, 639 Fed. App'x 810, 814 (3d Cir. 2016) (quoting *Shineski v.*

*Sanders*, 556 U.S. 396, 409 (2009)). According to *Shinseki*, 556 U.S. at 409, "the burden of showing that an error is harmful falls upon the party attacking the agency's determination." Here, Plaintiff has not done so with respect to her obesity. Plaintiff only argues that the ALJ failed to address both "why he determined that obesity resulted in no significant restriction in function" and "the extent to which [Plaintiff's] obesity impacts her ability to function given her other problems." (Pl. Br. at 11.) However, Plaintiff fails to explain how the failure to conduct such an analysis actually affected ALJ's disability determination. In other words, Plaintiff did not meet her burden of showing that her obesity would have impacted her overall disability determination.

After reviewing the ALJ's examination, the ALJ's decision as to Plaintiff's anxiety and obesity impairments are supported by "more than a mere scintilla" of evidence, and as such, are based on substantial evidence. *McCrea*, 370 F.3d at 360.

**B.  Substantial Evidence Supports the ALJ's Determination That Plaintiff's Impairment Was Not a Level of Severity That Met the Requirements of the Listings of Impairments**

Plaintiff argues that the ALJ's opinion, as required by Third Circuit precedent and Social Security Ruling 17-2p[3], failed to expressly analyze Plaintiff's severe impairments, and determine whether those impairments meet a disability listing. (Pl. Br. at 14.) Specifically, Plaintiff maintains that the ALJ failed to appropriately analyze and discuss the cervical and lumbosacral spine MRIs as related to the Listings of Impairments. (*Id.*) Plaintiff also argues that the ALJ failed to evaluate the proper weight assigned to evidence and did not provide an actual explanation for discounting the evidence that was rejected. (Pl. Br. at 15.)

---

[3] This Social Security Ruling (SSR) provides guidance on how adjudicators at the hearings and Appeals Council (AC) of the administrative review process make findings about medical equivalence in disability claims under Titles II and XVI of the Social Security Act. *Policy Interpretation Ruling* 82 Fed. Reg. 15,263 (Mar. 27, 2017).

### i.    The ALJ's 1.04 listing determination was based on substantial evidence.

At step three, the ALJ is required to consider each of the claimant's conditions in determining whether a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 was satisfied. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In addition, if the claimant has "a combination of impairments, no one of which meets a listing," the regulations require the ALJ to "compare [the claimant's] findings" with other potential "analogous listed impairments." 20 C.F.R. § 404.1526(b)(3). If the claimant is found to have a listed impairment or its equivalent, then she is considered disabled, and the inquiry ends. *See Plummer*, 186 F.3d at 428.

In *Burnett v. Social Security Administration*, the Third Circuit held that, at step three, the ALJ is "require[d] to set forth the reasons for [his] decisions[,]" and that it was insufficient to merely provide "conclusory statements" that an impairment did not meet certain listings. 220 F.3d 112, 119-20 (3d Cir. 2000).[4] While conclusory statements are insufficient, in *Jones v. Barnhart*, the Third Circuit elaborated that "*Burnett* does not require that the ALJ use particular language or adhere to a particular format in conducting [his] analysis." 364 F.3d at 504-05. The court stated that the purpose of *Burnett* was to ensure "that there is sufficient development of the record and explanation of findings to permit meaningful review." (*Id.* at 505.) Therefore, in *Jones*, the court found that although the ALJ did not identify or analyze the most relevant listing, the ALJ satisfied the *Burnett* standard by evaluating the available medical evidence in the record and setting forth the evaluation in the opinion. (*Id.*) The decision must "read as a whole" and be capable of providing meaningful judicial review. (*Id.*)

---

[4] In *Burnett*, the ALJ's step three analysis stated: "Although [Burnett] has established that she suffers from a severe musculoskeletal [impairment], said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations No. 4." (*Id.* at 119.)

Here, the ALJ's listing determination was based on substantial evidence and the ALJ sufficiently evaluated the medical record to provide meaningful judicial review. At step three, the ALJ found:

> Although the record documents the claimant's degenerative disc disease, the medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04. Moreover, there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b). As for the claimant's fibromyalgia, although fibromyalgia is not listed as a specific impairment, consideration was afforded to SSR 12-2p[5] in the evaluation of this impairment. It is noteworthy that although there is no specific medical listing regarding obesity, the undersigned has evaluated the impairment herein pursuant to the extensive and detailed guidelines set forth in SSR 19-2p, including the references to the listings associated with musculoskeletal, respiratory, cardiovascular, and endocrine disorders. . . Accordingly, the undersigned has fully considered obesity in the context of the overall record evidence in making this decision.

(A.R. 15.) The ALJ explained that Plaintiff's degenerative disc disease did not meet the requirements of Listing 1.04. (*Id.*) With respect to Listing 1.04 (Disorders of the Spine), Plaintiff must have established all of the following criteria:

> "Disorders of the spine (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis . . .; or

---

[5] This Social Security Ruling (SSR) provides guidance on how the Social Security Administration develops evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how it evaluates FM in disability claims and continuing disability reviews under Titles II and XVI of the Social Security Act. *Policy Interpretation Ruling* 77 Fed. Reg. 43,640 (July 25, 2012).

C. Lumbar spinal stenosis resulting in pseudo claudication . . . resulting in an inability to ambulate effectively, as defined in 1.00B2b."

20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.04. The ALJ explained that the medical evidence "did not establish the requisite evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis." (A.R. 15.) The ALJ supported this finding throughout his decision. For example, the ALJ noted that Plaintiff's "motor strength was 5/5" and that Plaintiff's spouse reported "she [can] make simple meals and do some cleaning and laundry." (A.R. 16.)  Furthermore, the ALJ noted that Plaintiff "reported she can pay bills and shop," but that "she is limited with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, and using her hands." (*Id.*) The ALJ noted that in 2019, Plaintiff complained of neck and back pain but denied numbness, tingling, or weakness. (A.R. 17.) Lastly, the ALJ documented that Plaintiff was diagnosed with degenerative disease in her cervical and lumbar spine, and for treatment, in addition to medication, that Plaintiff's doctor advised exercise. (*Id.*) The ALJ considered "[all] medical opinions and prior administrative medical findings in accordance with requirements of 20 CFR 404.1520c." (A.R. 15.)

Importantly, an ALJ is not required to use "magic language," or adhere to a certain format; rather, the decision need only contain a sufficient discussion of the evidence and explanation of the ALJ's reasoning to enable "meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F. 3d 500, 504 (3d Cir. 2009). Therefore, considering the ALJ's determination, I find the reasons for the ALJ's decision are adequately supported throughout the decision in a manner permitting meaningful judicial review. (A.R. 12-19.) As such, it is evident the ALJ considered the relevant medical records and found that the evidence did not meet Listing 1.04 (Disorders of the Spine).

### C. The ALJ's Residual Functional Capacity Determination is Supported by Substantial Evidence

Plaintiff argues that the ALJ failed to provide substantial evidence for finding that Plaintiff could perform the full range of sedentary work at step four. (Pl. Br. at 17.) Specifically, as to Plaintiff's physical limitations, Plaintiff claims that the ALJ incorrectly found her capable of performing manipulative abilities as described in 20 CFR §404.1567. (Pl. Br. at 17.) Plaintiff asserts that, in light of her muscle spasms of the cervical spine and pain involving multiple joints, the ALJ did not properly consider that Plaintiff's fibromyalgia, cervical degenerative disc disease, and related muscle spasms would hinder "repetitive hand-finger actions" as required by sedentary[6] work activity. (*Id.*) As to the mental aspect of the RFC, Plaintiff argues that the ALJ improperly discounted any functional restriction based on anxiety, as noted during step two. (*Id.*)

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a). When a case is brought to an administrative hearing, the ALJ is charged with ultimately determining the claimant's RFC. 20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e), 416.946(c). "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him[,]" and, "[a]lthough the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). When assessing a claimant's RFC, an ALJ must consider all the claimant's medically determinable impairments which are supported by the record,

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other secondary criteria are met." 20 C.F.R. § 404.1567(a)

including those considered non-severe. 20 C.F.R. §§ 404.1545 (a)(2), 416.945 (a)(2); *see also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

Here, the ALJ provided a sufficient analysis of Plaintiff's physical and psychological RFC limitations. In making his findings, "the [ALJ] considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR §404.1520c and SSR 16-3p." (A.R. 15.) In so doing, the ALJ considered the medical opinions and prior administrative medical findings, such as Plaintiff's treatment notes, prescription notes, personal testimony, husbands' testimony, and the opinions of the state agency medical providers. (A.R. 16.) Specifically, the ALJ noted that Plaintiff testified that she had stopped working due to pain and arthritis in her lower back, herniated discs in her neck, fibromyalgia, bursitis in both hips, and muscle spasms in her lower back and shoulder. (*Id.*) Plaintiff also stated that she tried physical therapy and oxycodone for pain, "but nothing really help[ed] too much." (*Id.*) The ALJ pointed out that that while "she can wash and dress herself," Plaintiff stated she does "have difficulty dressing at time due to pain." (*Id.*) Plaintiff stated that she does cook, "but sometimes will have to go lay down if she begins to have too much pain from standing." (*Id.*) Additionally, the ALJ noted that Plaintiff stated that "she can walk about two to three blocks[,] and [when sitting,] must move positions after 30-40 minutes." (*Id.*) The ALJ also examined Plaintiff's spouse's third-party function report, which described Plaintiff as having "some trouble with personal care due to pain." (*Id.*) The ALJ noted that the report further stated that "[Plaintiff] stretches due to [this] pain and no longer has a normal life." (*Id.*) Regarding

Plaintiff's degenerative disc disease, the ALJ reported herniations in her cervical and lumbar spine. (A.R. 17.) Furthermore, the ALJ documented Plaintiff's treatment notes from 2017 which demonstrated complaints of muscle aches, weakness, arthralgia, joint pain, and fatigue stemming from fibromyalgia. (*Id.*) In 2018, the ALJ further noted Plaintiff's description of her myofascial pain as "uncontrolled, with positive tender points in her upper body." (*Id.*) In 2019, the ALJ noted that Plaintiff complained of ongoing neck and back pain but denied any numbness, tingling, or weakness. (*Id.*)

Plaintiff's argument that her fibromyalgia and cervical degenerative disc disease would preclude "repetitive hand-finger actions" as required by most unskilled sedentary jobs is unavailing, because it lacks the support of objective medical findings during the relevant period.[7] (Pl. Br. at 17, A.R. 16-17.) First and foremost, for the first time on appeal, Plaintiff asserts that her fibromyalgia and degenerative disc disease "would be expected to result" in problems using her hands and fingers. (Pl. Br. at 17.)  Indeed, nowhere in the record did Plaintiff make any contention to the ALJ that any of her impairments somehow impacted her ability to use her hands and fingers in a sedentary work environment. (A.R. 24-44.) Therefore, because this issue was not raised below, the court can reject Plaintiff's argument on this basis alone. *See Wagner v. Berwick Indus.*, 122 F. App'x. 570, 572 (3d Cir. 2004) "[A]rguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances. (*e.g.*, the public interest requires that the issues be heard, or manifest injustice would result from the failure to consider such issues)." (citing to *Brown v. Phillip Morris, Inc.*,

---

[7] Plaintiff additionally argues that the ALJ's RFC finding is not supported due to the lack of mental limitations based on Plaintiff's anxiety (Pl. Br. at 17.) However, for the reasons explained, *supra*, the ALJ correctly found that the Plaintiff's anxiety disorder was non-severe and that it did not have any impact on Plaintiff's ability to perform sedentary jobs.

250 F.3d 789, 799 (3d Cir. 2001)). As there are no exceptional circumstances, this argument is waived.

Nevertheless, even if the court would consider this issue for the first time, Plaintiff was never sent for, nor received, any nerve conduction studies connecting her fibromyalgia to potential hand-finger impairments. (A.R. 45-62.) Rather, Plaintiff's neurological examinations were consistently unremarkable, reflecting normal motor strength and sensation in her arms and legs. (A.R. 262, 267-8. 272, 277, 282, 287, 292, 298, 304, 310, 315, 320, 325, 449.) Furthermore, the ALJ highlighted that Plaintiff's statements about the intensity, persistence, and limiting effects of her general fibromyalgia symptoms are inconsistent with the objective evidence. (A.R. 15-16.) While Plaintiff claimed that she "stopped working as a hairstylist due to pain in her back, neck, and shoulders and because it felt like her body was 'giving out,'" (A.R. 16, 32), during this time frame, "Plaintiff rejected any interventional pain procedures[,]" "missed three physical therapy sessions[,]" and reported her pain as "generally stable." (A.R. 17.) Moreover, although Plaintiff testified that she had trouble with her hands and fingers while using scissors and combs as a barber, (A.R. 32-33), she fails to provide any objective medical evidence to support her subjective pain as it relates to her fibromyalgia. (A.R. 45-62.)

As explained *supra*, the ALJ also considered the third-party function report from Plaintiff's spouse. The third-party function report detailed Plaintiff's difficulty with personal care, yet confirmed her capabilities of making simple meals, cleaning, laundry, shopping and paying bills. (A.R. 16-17.) Program Operation Manual System (POMS) DI 2500.001 provides that "[m]ost unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 83-10, 1983 WL 31251 at *5. Plaintiff's ability to perform these routine house tasks demonstrates motor skills satisfactory to "good use of the hands and fingers." (*Id.*)

In sum, the ALJ appropriately considered the entirety of the record, including medical reports, Plaintiff's subjective complaints, and the third-party function report. As such, I find the ALJ's RFC determination that Plaintiff could perform sedentary work was based on substantial evidence.

### D. Substantial Evidence Supports the ALJ's Decision that Plaintiff Could Engage in Alternative Work Based on the Medical-Vocational Guidelines (i.e., the "Grids")

Plaintiff argues that the ALJ erred by not obtaining testimony of a vocational expert, and instead, incorrectly relied on the Medical-Vocational Guidelines (the "Grids"). (Pl. Br. at 18-20.) Specifically, Plaintiff asserts, relying on *Sykes v. Apfel*, the ALJ "cannot rely on the 'framework' of the vocational guidelines where there is evidence of both exertional and non-exertional[8] impairments that have a significant impact on basic work-related ability." (Pl. Br. at 19.) (citing to *Sykes v. Apfel*, 228 F.3d 259, at 267 (3d Cir. 2000)) ("[T]he grids cannot automatically establish that there are jobs in the national economy when a claimant has severe exertional and non-exertional impairments.") Here, Plaintiff claims that she has non-exertional impairments, based on 20 C.F.R. § 404.1569a(c)(vi), in "her ability to use her hands and fingers from repetitive activity as was required by her past work," and therefore, the ALJ improperly relied on the Medical-Vocational Guidelines. (A.R. 21.) I disagree, and find that the ALJ's use of Medical-Vocational Guidelines was proper.

---

[8] Non-exertional limitations are described as limitations and restrictions imposed by claimant's impairment(s) and related symptoms, such as pain, that affect only that claimant's ability to meet the demands of jobs other than the strength demands. Some examples of non-exertional limitations include the following: (i) difficulty functioning because one is nervous, anxious, or depressed; (ii) difficulty maintaining attention or concentrating; (iii) difficulty understanding or remembering detailed instructions; (iv) difficulty in seeing or hearing; (v) difficulty tolerating some physical features of certain work setting (*e.g.*, cannot tolerate dust or fumes) or (vi) difficulty performing the manipulative or postural functions of some work such as reaching, handling, stopping, climbing, crawling, or crouching. 20 C.F.R. § 404.1569a(c).

The Medical-Vocational Guidelines (the "Grids") are "tables prepared by the Commissioner that evaluate a plaintiff's ability to work by matching the plaintiff's age, education, and work experience with her work capabilities." 20 C.F.R. pt. 404, Subpt. P, App. 2. "The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull." *Bridget S. v. Kijakazi*, No. 6:20-CV-1440, 2022 WL 2046364 (N.D.N.Y. Jun. 7, 2022) (citing 20 C.F.R. Pt. 404, Subpt. P, App 2). For example, "if strength limitations resulting from an individual's impairment considered with the judgments made as to the individual's age, education and work experience correspond to (or closely approximate) the factors of a particular rule, the adjudicator then has a frame of reference for considering the types of work precluded by other non-exertional impairments in terms of number of jobs remaining for a particular individual." 20 C.F.R. pt. 404, Subpt D. The Grids promulgate presumptions regarding jobs that exist in the national economy given the limitations possessed by the plaintiff. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). Essentially, "the grids are a shortcut that eliminate the need for calling in vocational experts." *Bohr v. Bowen*, 849 F.2d 219, 221 (6th Cir. 1988).

The Third Circuit has approved the use of Medical-Vocational Guidelines to determine the general availability of jobs as an alternative to the determination of specific jobs by vocational experts, so long as the claimant has solely exertional limitations. *Santise v. Schweiker*, 676 F.2d 925, 938 (3d Cir. 1982); *see also Breslin v. Comm'r of Soc. Sec.*, 509 F. App'x 149, 154 (3d Cir. 2013) (affirming that when a claimant has solely exertional limitations, his disability status may be determined by the Medical-Vocational Guidelines "without reference to additional evidence"). However, "when a claimant has nonexertional limitations, the ALJ must reference additional evidence when determining if those limitations erode the claimant's occupational base." (*Id.* at

154.) "[I]f a claimant's non-exertional impairments 'significantly limit the range of work permitted by his exertional limitations' then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." *Bapp v. Bowen*, 802 F.2d 602, 605 (2d. Cir. 1986) (citing *Blacknall*, 721 F.2d at 1181).

The ALJ's step five determination was based on substantial evidence and correctly adhered to the use of Medical-Vocational Guidelines.

The ALJ's opinion correctly concluded that Plaintiff did not have non-exertional hand-finger limitations that would preclude her from performing sedentary work.[9] (A.R. 14-18.) There is no medical evidence to support Plaintiff's assertion that her fibromyalgia and degenerative disc disease contributed to problems using her hands and fingers. (A.R. 45-62.) As explained *supra*, Plaintiff's neurological examinations reflected normal motor strength and sensation in her arms and legs. (A.R. 262, 267-8. 272, 277, 282, 287, 292, 298, 304, 310, 315, 320, 325, 449.) While Plaintiff suffered from fibromyalgia and degenerative disc disease, "the preponderance of the evidence shows that [Plaintiff's] physical pain, [stemming from these two diseases,] limits her exertional activities but does not preclude sedentary type work." (A.R. 17, 45-62.)

In sum, Plaintiff's argument that the medical record during the relevant period established non-exertional limitations has no merit. (Pl. Br. at 17-19, A.R. 24-62.) As such, because Plaintiff does not have non-exertional limitations, the ALJ's use of the Grids was proper. Therefore, I find that the ALJ's determination that there were jobs available for Plaintiff in the national economy to be based on substantial evidence.

---

[9] As discussed *supra*, Plaintiff's appeal was the first time that she claimed her fibromyalgia and degenerative disc disease impacted her hand-finger movement. (Pl. Br. at 17-19.)

IV.  **CONCLUSION**

For the reasons set forth above, the ALJ's decision is **AFFIRMED.** An appropriate Order shall follow.


Date:   June 24, 2022                                    /s/ Freda L. Wolfson
                                                        Freda L. Wolfson
                                                        U.S. Chief District Judge